[Civ. No. 26581. First Dist., Div. Three. Feb. 18, 1971.]

NOVELITA CALLAHAN, a Minor, etc., Plaintiff and Appellant, v. CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

## COUNSEL

Funsten & Caldwell, James W. Funsten, Bacon, Stone, O'Brien & Hammond and James D. Hammond, Jr., for Plaintiff and Appellant.

Thomas M. O'Connor, City Attorney, and George E. Baglin, Deputy City Attorney, for Defendant and Respondent.

## OPINION

**BROWN (H. C.), J.**—This is an appeal from a summary judgment in favor of defendant, the City and County of San Francisco (City), in an action in which plaintiff claims she was injured due to the joint negligence of defendant City in the design and maintenance of an intersection, and other defendants who were driving motor vehicles at that intersection.

The record of the proceedings discloses that after plaintiff commenced this action naming the City and the drivers of the vehicles as defendants, the City demurred to the complaint and the demurrer was sustained. The judgment following the sustaining of the demurrer was reversed on a prior appeal to this court. (See *Callahan* v. *City and County of San Francisco,*

249 Cal.App.2d 696 [57 Cal.Rptr. 639].) Thereafter the City filed its answer to plaintiff's complaint and moved for a summary judgment. The summary judgment was granted, and the appeal from this judgment is before us.

In the earlier appeal in this action relating to the City's demurrer, the appellate court did not have before it the issues now presented by the affirmative defenses. The City's answer to plaintiff's complaint alleges (1) that the sole cause of the accident was the negligent driving of the vehicles involved, and (2) that the City had immunity under Government Code section 830.6, as the street design had been approved by the public entity prior to construction. These affirmative defenses are founded on evidence in the declarations filed by the City in support of the motion for summary judgment. These defenses and evidentiary matters were not before the court in the prior appeal.

During the course of these proceedings, plaintiff settled with and dismissed the action as to all defendants except the City. We are concerned now *only* as to whether the pleadings and declarations of the parties present a triable issue as to the negligence of the City. In determining the existence of such triable issue, we view the pleadings and declarations in a light most favorable to appellant. (See *Stationers Corp.* v. *Dun & Bradstreet, Inc.,* 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].)

The declaration of plaintiff (now appellant) in opposition to the City's motion for summary judgment stated that the street, Brotherhood Way, on which plaintiff was traveling as a passenger in an automobile, was built with the appearance of a freeway and ended in a dead end at the intersecting street of Lake Merced Boulevard; that it was sometimes extremely foggy, and the driver, believing he was on a freeway, was driving between 55 and 65 miles per hour; that about 300 feet before he came to the dead end of Brotherhood Way he ran into a very heavy fog and could only see about 150 feet; that "[t]here were not adequate warning devices to alert a person driving in fog conditions that this six lane roadway terminated abruptly with a cliff dropping into a lake," and, further, that there were some 29 accidents at this intersection from 1960 to 1964, the year of this accident, which would indicate that the intersection was a dangerous one.

It is plaintiff's contention that her complaint for damages and her declaration in opposition to the motion disclose that "The street and intersection were so negligently maintained that it was reasonably likely that a careful driver, in foggy conditions, might continue over the end of the road into the logs, trees or lake. No adequate warning signs or devices were provided by the city. [Fn. omitted] . . . [That it] was reasonably foreseeable

[by City] that as a consequence of the dangerous condition such an accident would occur." (*Callahan* v. *City and County of San Francisco, supra,* 249 Cal.App.2d 696, 698.)

In support of the City's affirmative defenses and its motion for summary judgment, the declarations of the witnesses disclosed the following facts which were not contradicted: Brotherhood Way runs in a general east-west direction. It ends at Lake Merced Boulevard which runs in a north-south direction. The intersection is known as a "T" intersection. On the night of the accident, plaintiff was a passenger in an auto driven by one James Day; that just prior to coming to the intersection of Brotherhood Way and Lake Merced Boulevard, *Day was drag racing his auto with two other vehicles;* that Day had passed the other autos traveling at about 65 miles per hour; that plaintiff screamed, plead and prayed with Day to slow down to no avail.

Lawrence Daniels testified that he also was a passenger in the Day automobile and said to Day, ". . . Man, you ought to slow down a little bit so we can see, because we don't know what is in front of us!"; that he heard [plaintiff] appellant complain to Day about his driving and said, "Stop! . . . Oh my God. Let me out! She was frightened or something." The intersection was heavily lighted with artificial lights.

The City also produced the declaration of Police Officer Vincent Senatore who was in the process of investigating another accident at the scene. His declaration disclosed that the intersection was lighted by double pendant lights; that there was a warning reflector sign for westbound vehicles on Brotherhood Way; that such vehicles were approaching from Lake Merced Boulevard; that there were directional signs at the intersection; and that Lake Merced Boulevard at its intersection with Brotherhood Way was 76 feet wide, the parking lot was 114 feet wide, the curb was 6 inches high. Officer Senatore observed that two vehicles were involved in the accident, one driven by Day and the other by Lewis, and that the vehicles were traveling at "a speed of at least 60 miles per hour"; that the posted speed limit was 45 miles per hour; that the Day vehicle went through the intersection, through the parking lot, through a 3-foot high white fence with logs resting at the fence's base, down the bank of Lake Merced to the shore; that a third car driven by Lee Jackson was behind the other vehicle but stopped before it came to the parking lot, and that the speed limit at the time under foggy conditions was 15 miles per hour.

The City also presented declarations of its city engineer and assistant city engineer and other employees in the traffic division of its department of public works. These declarations disclosed that no accident such as this one had been known to occur at the intersection, that is, an accident in

which a vehicle westbound on Brotherhood Way had run across the end of Brotherhood Way. No complaints had been recorded that the intersection was considered to be dangerous. Based on traffic counts, it was estimated that traffic volume through the intersection during the period January 1, 1960 through June 30, 1964, was not less than 13,614 vehicles per day.

The city engineer, Mr. Levy, stated in a declaration that "T intersections are safer than Y intersections" because there is not the danger of head-on collisions, a more dangerous collision than the right-angle type collisions which occur at T intersections and other right-angle intersections.

In the declaration of assistant city engineer, Mr. Geertz, who approved the plans for the modification of the road in 1957, modifications of the intersection were prepared and approved in accordance with good engineering practice. At that time the T intersection had existed for approximately 22 years. Mr. Geertz declared that when he approved the plan and design of the modifications he had no knowledge or notice that the intersection was dangerous in any respect, particularly in respect to the danger that a careful driver might continue over the end of Brotherhood Way.

Declarant, Charles Lang, a traffic engineer in the department of public works, disclosed that from January 1, 1960 through June 30, 1964, a four and one-half year period, 19,878,440 vehicles had passed through the intersection of Brotherhood Way and Park Merced Boulevard. During this time there were 29 accidents, or one accident per 685,000 vehicles; that although 29 accidents occurred at the intersection, his department had no record of any accident like the one in question; that is, one in which an automobile westbound on Brotherhood Way went through the intersection of Lake Merced Boulevard.

In order to establish liability of a public entity for a dangerous condition under applicable provisions of the Tort Claims Act of 1963 (Gov. Code, § 810 et seq.), plaintiff must establish the elements required by section 835 of the Government Code. That section provides: "*Except as provided by statute,* a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (Italics added.)

"A dangerous condition is defined by statute as a 'condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property . . . is used with due care in a manner in which it is reasonably foreseeable that it will be used.' (Gov. Code, § 830.) Whether a given set of facts and circumstances creates a dangerous condition is usually a question of fact and may only be resolved as a question of law if reasonable minds can come to but one conclusion. [Citations.]" (*Bakity* v. *County of Riverside,* 12 Cal.App.3d 24, 30 [90 Cal.Rptr. 541]; see also *Curreri* v. *City etc. of San Francisco,* 262 Cal. App.2d 603, 611 [69 Cal.Rptr. 20].)

We have concluded that the summary proceedings have clearly eliminated the issue of negligence of the City in either permitting a dangerous condition to exist or of any negligent maintenance. It has shown that despite a heavy volume of daily automobile traffic, no other such accident had occurred over a period of four and one-half years. The declaration of plaintiff's attorney stated that three of the accidents over the four and one-half years occurred in conditions of fog. They did not, however, involve drivers of cars driven on Brotherhood Way who did not become aware of the intersection in time to stop. Rather, they involved vehicles driving on the intersecting Lake Merced Boulevard. In other words, despite frequent fogs and the fact it might be established that Brotherhood Way looks like a freeway, no other car in four and one-half years has failed to become aware of the intersection in time either to stop or to make the turn onto Lake Merced Boulevard.

The statistics of vehicular traffic at the intersection of Brotherhood Way and Lake Merced Boulevard show that in excess of 19 million vehicles traversed the intersection during a period of four and one-half years prior to the accident. The paucity of accidents occurring during this time clearly indicates that the intersection was a safe one except for drivers described by the witness here, i.e., "maniacal" or driving at an excessive and hazardous speed.

There is further evidence not disputed by plaintiff which strengthens the City's contention that careful drivers would not overshoot the end of Brotherhood Way even in a heavy fog. The three cars involved here were racing down Brotherhood Way. Two ran into the parking lot. However, appellant's car went through logs, through a fence, down the embankment to Lake Merced. One was able to stop at the parking lot, and the third car was able to stop in the intersection without going into the parking

lot. This third car was obviously traveling in exactly the same conditions except that it was going at a slightly slower speed. Considering this fact and the absence of similar accidents or complaints, it seems that the only conclusion reasonable men could draw is that this intersection under conditions of fog did not constitute a dangerous condition for drivers exercising due care.

The City's declaration also established that the plan and design of the Brotherhood Way-Lake Merced Boulevard intersection and its lighting system were approved in advance of construction by an authorized officer of the City government. Therefore, neither the City nor its employees would be liable under the immunity provided in Government Code section 830.6.

Plans for the modification of the intersection were approved by Assistant City Engineer Clifford J. Geertz in 1957 and 1960, in advance of construction. This was substantial evidence that a reasonable employee would approve design modifications without the necessity of installing other warning devices than those already present despite appellant's contention to the contrary.

The statistical facts heretofore referred to disclose that in the course of four and one-half years there was only one accident per 685,000 cars fortify the conclusion that reasonable discretion and judgment were exercised by those in authority who approved the plan and design prior to construction. We have concluded that not only is there a complete absence of evidence that the intersection was a dangerous one, but also that the design defense, as shown here, is entirely adequate to sustain the summary judgment. (See *Moritz* v. *City of Santa Clara*, 8 Cal.App.3d 573 [87 Cal.Rptr. 675]; *Cabell* v. *State of California*, 67 Cal.2d 150 [60 Cal.Rptr. 476, 430 P.2d 34]; *Becker* v. *Johnston*, 67 Cal.2d 163 [60 Cal.Rptr. 485, 430 P.2d 43].)

It also follows that the City was not required to provide a warning by signals, signs or other devices. Such warning devices are required under Government Code sections 830.8 and 830 (fog) only if a dangerous condition exists. (*Pfeifer* v. *County of San Joaquin*, 67 Cal.2d 177 [60 Cal.Rptr. 493, 430 P.2d 51].) We have concluded that no dangerous condition existed, therefore, those sections are inapplicable.

The judgment is affirmed.

Draper, P. J., and Caldecott, J., concurred.