2002-NMCA-059

47 P.3d 448

David RUTHERFORD, as Personal Representative of the Estate of Rhonda Adele Rutherford, Deceased; David Rutherford and Bobbie Flenniken, Individually and as Co–Personal Representatives of the Estates of Taletha Jean Rutherford, Deceased and Joseph Thornton Rutherford, Deceased; John Rutherford; and Michael and Debra Thomas, Individually and as Co–Personal Representatives of the Estate of Donovan J. Thomas, Deceased, Plaintiffs–Appellants,

v.

CHAVES COUNTY and Board of County Commissioners of Chaves County, Defendants–Appellees.

No. 21,335.

Court of Appeals of New Mexico.

April 4, 2002.

Certiorari Granted, No. 27,487, May 20, 2002.

Donald E. Martinez, Joseph M. Fine, Fine & Faure, P.A., Albuquerque, NM, for Appellants, Bobbie Fleniken, Michael Thomas and Debra Thomas.

Gary C. Mitchell, Ruidoso, NM, for Appellants, David Rutherford and John Rutherford.

James R. Wood, Gary L. Gordon, Alice Tomlinson Lorenz, Miller, Stratvert & Torgerson, P.A., Albuquerque, NM, for Appellees.

## OPINION

FRY, Judge.

{1} Plaintiffs appeal from summary judgment in favor of Defendant Chaves County based on sovereign immunity. We hold that the County was not immune to suit in this case because the County's allegedly negligent acts constitute highway maintenance, for which the Tort Claims Act (TCA) waives immunity. Accordingly, we reverse.

## BACKGROUND

{2} This is an action for personal injury and wrongful death based on an accident that occurred in July 1996 on Spence Road in Chaves County, New Mexico. Spence Road is a short local access road that intersects Walnut Creek. Walnut Creek is normally a dry arroyo under U.S. Highway 285 that crosses Spence Road through a dip. There are signs on Spence Road on both sides of the dip at appropriate intervals approaching Walnut Creek warning motorists of the "DIP" and to "WATCH FOR WATER."

{3} On the evening of July 14, 1996, rain on the nearby flood plain and mountains caused Walnut Creek to flow at flood stage across Spence Road, although there was no rain in the immediate vicinity. Two vehicles attempted to drive through the water. The driver of one of the vehicles was Plaintiff John Rutherford, who was returning home from a party with his wife, Rhonda Adele Rutherford, their two children, Taletha Jean Rutherford and Joseph Thornton Rutherford, and another child, Donovan J. Thomas. The rapidly running water carried Rutherford's car downstream. Rutherford was able to escape from the car, but his wife and all three children drowned.

{4} At the time of the accident, it was the County's practice to use portable barricades to close Spence Road when it received notification that the arroyo was flooding. On this particular night, someone told the County sheriff's department that the arroyo was flooding, and the sheriff's department notified the County road department. The road department's employees were on their way to Spence Road with the barricades when Rutherford attempted to drive through the water.

{5} Rutherford and the personal representatives of the decedents' estates (Plaintiffs) sued the County, claiming that the County could have done more in the event of flooding to prevent injury to motorists on Spence Road. Plaintiffs theorized that the County was negligent in several ways. Plaintiffs contended the County was negligent in relying on a purely reactive system of dealing with flooding; however, if a reactive system was appropriate, the County negligently failed to include safeguards such as an effective means of communication among public agencies and a systematic approach to flooding. Alternatively, Plaintiffs claimed the County could have implemented a proactive system of dealing with flooding, such as a system of monitoring weather that would permit anticipation of flood conditions.

{6} The County sought summary judgment, arguing that the TCA's waiver of sovereign immunity for the negligence of public employees in the "maintenance" of a highway does not include the negligent acts or omissions alleged by Plaintiffs. The district court agreed and granted summary judgment against Plaintiffs.

## DISCUSSION

{7} We review a grant of summary judgment in the light most favorable to the party opposing the motion. *Pollock v. State Highway & Transp. Dep't*, 1999-NMCA-083, ¶ 5, 127 N.M. 521, 984 P.2d 768. The determination of whether governmental immunity under the New Mexico Tort Claims Act bars a tort claim is a question of law which we review de novo. *Godwin v. Mem'l Med. Ctr.*, 2001-NMCA-033, ¶ 23, 130 N.M. 434, 25 P.3d 273, *certs. granted*, 130 N.M. 459, 26 P.3d 103 (2001).

{8} At issue is NMSA 1978, § 41-4-11 (1991) of the Tort Claims Act:

A. The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties during the construction, and in subsequent maintenance of any bridge, culvert, highway,

roadway, street, alley, sidewalk or parking area.

B. The liability for which immunity has been waived pursuant to Subsection A of this section shall not include liability for damages caused by:

(1) a defect in plan or design of any bridge, culvert, highway, roadway, street, alley, sidewalk or parking area;

(2) the failure to construct or reconstruct any bridge, culvert, highway, roadway, street, alley, sidewalk or parking area[.]

The statute thus waives immunity for maintenance of a highway but not for the design of a highway.

{9} We note at the outset that the County seems to have mischaracterized the issue to be decided in this appeal. The County focuses on only one of Plaintiffs' allegations of negligence—the failure to implement a proactive weather forecasting system to predict flooding. Through this narrow prism, the County then appears to equate the tort concept of duty with the concept of sovereign immunity; it seems to argue that the TCA's specific waivers of immunity also define a governmental entity's duty. From this the County concludes that the legislature could not have intended to waive immunity for a road maintenance entity's failure to establish a weather forecasting system.

{10} We disagree with the County's characterization of the issue for two reasons. First, by focusing on Plaintiffs' theory for a proactive system of flood prediction, the County has overlooked the crux of Plaintiffs' negligence theory, which is that the County failed to place barricades on Spence Road before flood waters reached dangerous levels. Plaintiffs posited several actions the County could have taken to achieve this end, including: (1) surveying the County to determine areas in which rainfall culminates in the flooding of road crossings; (2) monitoring "the sky, weather reports, reports from citizens and other agencies and entities to be prepared for a flooding situation before flooding actually occurs"; (3) "educating the public that the road department and the sheriff's department are relying on the public for phone calls to warn them of potential ...

or actual flooding situations"; (4) "coordinat[ing] efforts between the sheriff's department and road department to report flooding conditions"; and (5) having a telephone that was answered after regular working hours, given the existing dependence on public reporting. All of these actions theoretically could provide the County with information that would permit it to place barricades when they were needed. Thus, contrary to the County's argument, we must assess whether the County's failure to place barricades at the appropriate time constitutes highway maintenance for which the TCA has waived immunity.

{11} Second, the concepts of duty and immunity under the TCA are distinct. It is established law that the TCA cannot be viewed as a source of duties to be imposed on government entities. "Duty or responsibility is not provided in the Tort Claim[s] Act; it must be found outside the Act either at common law or by statute." *Johnson v. Sch. Bd. of Albuquerque Pub. Sch. Sys.*, 114 N.M. 750, 751, 845 P.2d 844, 845 (Ct.App.1992); *see also Fireman's Fund Ins. Co. v. Tucker*, 95 N.M. 56, 59, 618 P.2d 894, 897 (Ct.App.1980) ("No new duties are created by the Tort Claims Act.").

{12} Moreover, the duty the County owed to Plaintiffs in the present case is well established by the common law. The parties do not dispute that the County had the responsibility to maintain the road in question. This responsibility to maintain is simply another way of saying that the County, as opposed to some other governmental entity, has jurisdiction over the road in question. This responsibility in turn gives rise to a duty to the public: "the [State] Department [of Transportation] has always had the common-law duty to exercise ordinary care to protect the general public from foreseeable harm on the highways of the state." *Lerma v. State Highway Dep't*, 117 N.M. 782, 784, 877 P.2d 1085, 1087 (1994). It follows that counties have the same duty of care with respect to the maintenance of roads and highways under their jurisdiction.

{13} In the context of this established duty of care, there may arise issues of wheth-

er the harm sought to be remedied is foreseeable to the highway authority. *See, e.g., Ryan v. N.M. State Highway & Transp. Dep't,* 1998–NMCA–116, ¶ 14, 125 N.M. 588, 964 P.2d 149 (holding that highway department's duty to remedy the danger of elk crossing the highway was contingent on a jury finding that highway department had notice of the danger). Here, there is no such issue. It is undisputed that the County knew Spence Road flooded at times, as evidenced by the sign warning motorists to watch for water and by the County's longstanding practice of erecting barricades when the road was flooded. Consequently, there is no question that the County owed Plaintiffs the duty to exercise ordinary care to protect them to some extent from the danger of flooding.

{14} It is the extent of effort required that is the source of the County's concern. In the County's view, it should not be required to take the extreme step of establishing its own weather forecasting system in order to predict flooding on Spence Road. In our view, this is a question of whether the County breached its common law duty of care-not a question of sovereign immunity. If the TCA waives immunity for the County's alleged acts of negligence in this case-an entirely separate question-it is a fact question whether the County's posting of warning signs constituted sufficient effort to satisfy its duty to use ordinary care, or whether the County should have taken additional steps to remedy the danger. *See Lerma,* 117 N.M. at 784, 877 P.2d at 1087 (explaining that "[i]t is for the factfinder to decide whether [highway department's] duty includes either the erection or maintenance of fences along an urban freeway" where plaintiff teenager climbed fence adjacent to freeway and was struck while crossing the freeway); *Rickerson v. State,* 94 N.M. 473, 476, 612 P.2d 703, 706 (Ct.App.1980) (stating that, in a case where TCA maintenance waiver applies, it is a jury question whether highway department was negligent in failing to install adequate signals at intersection). That fact question is not before us and it was not before the trial court.

{15} This leads us to the issue before this Court: whether the County's alleged negli-

gent acts or omissions constitute maintenance for the purpose of the TCA's waiver of immunity. We look to Plaintiffs' specific allegations to determine whether they involve maintenance. *Blackburn v. State,* 98 N.M. 34, 36, 644 P.2d 548, 550 (Ct.App.1982). Here, the complaint alleged only that the County was negligent "in maintaining or failing to properly maintain the culvert, highway, roadway, and street." However, as previously noted, Plaintiffs argued that the County was negligent in failing to barricade Spence Road before flooding reached a dangerous level. Plaintiffs' expert, David Steitle, explained that the County's present system does not help the County determine the critical time for erecting barricades. The present system relies on after-the-fact citizen reporting which can result in the County responding to flooding conditions too late to be preventive. He noted that Walnut Creek runs for many miles before it reaches the site of the accident. Consequently, by the time flood waters reach the Spence Road crossing, it is too late to warn motorists of the danger. In addition, Steitle testified that even if the County's reactive system was an appropriate means for coping with flooding, the system as it now exists is inefficient and disorganized. The County relies on citizens to report flooding when it occurs, but citizens have no way of notifying the County after hours because no one at the County's offices answers the phone at that time. A citizen's only recourse would be to contact the sheriff's department which would then contact the County's road department via cell phone, but this roundabout, uncoordinated reporting method could result in potentially dangerous delay.

{16} Steitle further testified that, as an alternative to the existing reactive system, the County could institute a proactive system that might include monitoring of weather radar or the National Weather Service to determine where rainfall is likely or has occurred. If such monitoring were unavailable or impractical, the County could use "the eyes and ears of the sheriff's department" as a weather monitoring system that would report to the County road department. This would require a coordinated system of com-

munication between the sheriff's department and the road department.

{17} Thus, contrary to the dissent's view of this case, Plaintiffs' allegations of negligence rested not only on the failure to implement a proactive system of weather monitoring but also and alternatively on the failure to impose some organization and efficiency on the existing reactive system. It is clear from Steitle's testimony that at the heart of these various theories of liability is the notion that the County should have done something more than it did to determine when to prevent motorists from attempting to cross Walnut Creek at times of flooding. A review of our case law on this subject convinces us that this notion is the same thing as saying that the County negligently maintained Spence Road.

{18} This Court has analyzed Section 41–4–11 on numerous occasions and has determined that the following activities do not constitute highway maintenance: permitting dogs to roam loose on streets in violation of animal control ordinances, *Smith v. Village of Corrales,* 103 N.M. 734, 737, 713 P.2d 4, 7 (Ct.App.1985); issuing a driver's license without proof of insurance, *Dunn v. State ex rel. Taxation & Revenue,* 116 N.M. 1, 5, 859 P.2d 469, 473 (Ct.App.1993); and failing to install wheelchair ramps on sidewalks, *Villanueva v. City of Tucumcari,* 1998–NMCA–138, ¶ 8, 125 N.M. 762, 965 P.2d 346. In addition, our appellate courts have held that other activities are highway maintenance under the TCA: failing to warn that a right lane is not a right-turn lane, *Blackburn,* 98 N.M. at 36, 644 P.2d at 550; failing to warn of or correct an allegedly dangerous intersection, *Grano v. Roadrunner Trucking, Inc.,* 99 N.M. 227, 228, 656 P.2d 890, 891 (Ct.App. 1982); issuing a highway permit to an oversize vehicle during a busy holiday weekend, *Miller v. N.M. Dep't of Transp.,* 106 N.M. 253, 255, 741 P.2d 1374, 1376 (1987), *abrogated by* NMSA 1978, § 41–4–3(E)(1) (1995) (stating, pursuant to 1991 amendment, that " 'maintenance' does not include . . . conduct involved in the issuance of a permit, driver's license or other official authorization to use the roads or highways of the state in a particular manner"); negligently locating a

school bus stop, *Gallegos v. Sch. Dist. of W. Las Vegas,* 115 N.M. 779, 781, 858 P.2d 867, 869 (Ct.App.1993); failing to erect or maintain a fence alongside a highway, *Lerma,* 117 N.M. at 784, 877 P.2d at 1087; failing to warn of the presence of elk in the vicinity of a highway, *Ryan,* 1998–NMCA–116, ¶¶ 2–4, 125 N.M. 588, 964 P.2d 149; and failing to post "wrong way" signs on freeway exit ramps, *Pollock,* 1999–NMCA–083, ¶ 8, 127 N.M. 521, 984 P.2d 768.

{19} At first blush, the alleged negligence in this case seems more like the activities that have been held to constitute maintenance. Closer scrutiny bears this out. Although highway maintenance has been defined as "care or upkeep," *Smith,* 103 N.M. at 736, 713 P.2d at 6, this Court has consistently held that allegations of inadequate or absent traffic controls fall within Section 41–4–11's waiver of immunity for highway maintenance. *Gallegos,* 115 N.M. at 781, 858 P.2d at 869; *Grano,* 99 N.M. at 228, 656 P.2d at 891; *Blackburn,* 98 N.M. at 36, 644 P.2d at 550; *Rickerson,* 94 N.M. at 476, 612 P.2d at 706. Here, Plaintiffs alleged the County could have and should have done something more than it did to determine when to barricade Spence Road in order to prevent motorists from crossing Walnut Creek at times of flooding, which is the same thing as saying that the County's existing methods of traffic control were inadequate. Plaintiffs' allegations all make one basic contention: the County failed to achieve one objective-the timely controlling of traffic on Spence Road to keep it from entering the Walnut Creek crossing when water was high. This objective is entirely consistent with the notion of highway maintenance as developed by our appellate courts.

{20} Moreover, contrary to the dissent's perspective, our case law has not limited the concept of maintenance to "fixed remedies" for static dangerous conditions. Dissent ¶ 42. For example, the location of the school bus stop in *Gallegos* and the placement of elk warning signs in *Ryan* were remedies that may need to be changed as governmental entities learn or should learn about changes in the needs of school children or in the

movement of elk. The concept of highway maintenance must have some fluidity in accordance with what government knows or should know about dangerous highway conditions.

{21} "The sole purpose of waiver in Section 41–4–11(A) is to ensure that highways are made and kept safe for the traveling public." *Miller,* 106 N.M. at 255, 741 P.2d at 1376 (emphasis omitted). Plaintiffs' theory of the County's liability is consistent with this purpose and with the relevant precedent, and we therefore hold that the County is not immune from suit.

## CONCLUSION

{22} We reverse summary judgment in favor of the County and remand for proceedings consistent with this opinion.

{23} **IT IS SO ORDERED.**

I CONCUR: LYNN PICKARD, Judge.

JONATHAN B. SUTIN, Judge
(dissenting).

SUTIN, Judge (dissenting).

{24} I respectfully dissent.

## INTRODUCTION

{25} Tort Claims Act (TCA) Section 41–4–11(A) says immunity does not apply to liability for damages caused by negligence *in subsequent maintenance of any roadway.* The district court granted the County's motion for summary judgment of immunity. We must determine, through statutory construction of Section 41–4–11(A), whether the alleged negligent act falls within "subsequent maintenance." "The meaning of statutory language is a matter of law, not a question of fact." *Romero Excavation & Trucking, Inc. v. Bradley Constr., Inc.,* 1996–NMSC–010, ¶ 5, 121 N.M. 471, 913 P.2d 659 (internal quotation marks and citation omitted).

{26} Plaintiffs' allegations of negligence funnel into a failure to implement a process that will stop traffic from entering Spence Road when dangerous waters are in Walnut Creek. This of course requires more than warning signs. It requires monitoring actual and potential rainfall, and instituting formal processes by which actual and potential rain-

fall can be monitored and also by which law enforcement and other County officials and citizens know to report and how to report actual and potential rainfall. The County would also have to assure a process of communication among County agencies so barricades can be placed in time to stop vehicles from crossing Walnut Creek. The question is, did the Legislature intend these acts to constitute "subsequent maintenance"?

{27} The County put up "DIP" and "WATCH FOR WATER" warning signs, the adequacy of which Plaintiffs do not attack. Plaintiffs require more than signs. They require development and implementation of a system of information gathering and communication channels to obtain information and reports on the existence of rainstorms likely to contribute surface water run-off to Walnut Creek and then across Spence Road.

{28} The majority permits Plaintiffs to proceed past the gate of immunity by stripping the negligent act to a skeleton allegation of negligent failure to place barricades. Placement of barricades is then likened to placement of traffic controls. In the majority's view, the skeleton averment of negligent failure to place barricades allows passage through immunity, on to the jury to decide whether the County was negligent. I respectfully disagree with the majority's analysis and approach.

{29} In the majority's view, the County mischaracterizes the issue and then "appears to equate the tort concept of duty with the concept of sovereign immunity" and "seems to argue that the TCA's specific waivers of immunity also define a governmental entity's duty." Majority Opinion ¶ 9. In my view, the County's characterization of the issue is correct. Nor does the County confuse duty and immunity.

{30} The County states that "[t]he only issue presented to the trial court was whether the statutory language waiving immunity for liability arising out of the negligence in the 'maintenance of any bridge, culvert, highway, roadway, street ...' would apply to a claim that a county government had failed to design and put into operation a proactive, weather-based forecasting system and to close rural county roads when such a fore-

casting system would have predicted severe thunderstorms or floods." The County argues that "[t]he determination of whether governmental immunity under the [TCA] bars a tort claim is a question of law for the Court to decide."

{31} The County's position on appeal is indisputably that this Court must interpret the TCA, a process involving questions of law and policy. More particularly, the County points out that our analysis "must begin with an examination of the [TCA] because the potential tort liability of governmental entities and public employees is limited by that Act." The County then argues that "New Mexico's appellate courts have not construed 'maintenance' so broadly as to include developing and implementing a 'proactive system to warn motorists of flooding . . . utilizing available weather data to predict potential flooding' or any other similar system."

{32} Thus, on the issue of what is the issue, these statements from the County's answer brief unmistakably constitute express assertions that the issue in this case is whether immunity exists or is waived and that this is an issue of law for this Court to decide. The County has squarely and properly presented the correct issue for us to decide in this appeal.

{33} On the issue of confusion of duty and immunity, the majority may have been understandably misled by Plaintiffs' brief in chief, not the County's answer brief. Plaintiffs avoid arguing that "subsequent maintenance" in Section 41–4–11(A) should be interpreted to mean and include the implementation of a proactive system beyond the road signs. Plaintiffs' argument is that a jury should decide whether the County "breached their duty to warn [motorists] of flooding or potential flooding by failing to institute a proactive system."·

{34} It is, therefore, Plaintiffs who conflate immunity with breach of duty. In their entire brief in chief (they filed no reply brief) Plaintiffs cite and refer to Section 41–4–11(A) *only once,* and only then under standard of review—not in argument, where Plaintiffs simply paraphrase the statute: "The New Mexico legislature has waived immunity from liability where a governmental agency fails to maintain, or negligently maintains a roadway. *See* NMSA 2000 [sic 1978], § 41–4–11(A)." That is it. Plaintiffs do not address the issue whether the negligent act or acts they allege come within "subsequent maintenance" in Section 41–4–11(A). Plaintiffs engage in no statutory interpretation. Plaintiffs' sole point on appeal and sole focus is on duty: that because the County was negligent, the district court erred in dismissing Plaintiffs' claim.

{35} My purpose in the foregoing discussion of differing views of the parties' presentations on appeal is not only to respond to the majority's discussion on the presentations. I expand on the differing views to capture the majority opinion's under-layer and thereby better understand the majority's approach and analysis.

{36} The majority correctly states that the concepts of duty and immunity under the TCA are distinct. Majority Opinion ¶ 11. The majority discusses the duty owed to Plaintiffs by the County under the common law, and ultimately holds that whether the County "should . . . be required to take the extreme step of establishing its own weather forecasting system in order to predict flooding on Spence Road [was] a question of whether the County breached its common law duty of care—not a question of sovereign immunity." Majority Opinion ¶¶ 12, 14. By this distinction, the majority paves the way to a determination that, in considering the immunity issue, it is not necessary to consider the negligent act as anything more than the failure to place barricades. A weather forecasting system is irrelevant to the immunity issue.

{37} The majority thinks the County's focus on a proactive weather forecasting system as the negligent act is too narrow a focus, in that it looks at only one of several allegations of negligence. Majority Opinion ¶ 9. But the County's focus is the proper one, because the various failures that Plaintiffs allege necessarily include, as well as result in, the County's failure to have a proactive weather monitoring, forecasting, and report-

ing system.[1]   In fact, it is the majority that defines the negligent act too narrowly and restrictively.  The majority opens the immunity gate by limiting Plaintiffs' negligence theory to a bare bones "fail[ure] to place barricades on Spence Road before flood waters reached dangerous levels."  Majority Opinion ¶ 10.  The majority calls this the "crux" of Plaintiffs' negligence theory.  *Id.*  With this restriction, and by avoiding what is really the crux of Plaintiffs' negligence theory, namely, a proactive weather monitoring, forecasting, and reporting system, the majority permits Plaintiffs to slip through the immunity gate.  The majority does so based on two notions, neither of which, in my opinion, is sound.

{38} The first notion is the majority's view that all Plaintiffs are saying is that the County should have done something more than place warning signs, and are not necessarily saying that the County should have had a weather forecasting system; that is, the "extent of effort required" to do something more to protect motorists does not mean that the County must "take the extreme step of establishing its own weather forecasting system in order to predict flooding on Spence Road." Majority Opinion ¶ 14.  The fact of the matter, however, as the majority itself states, is that Plaintiffs *require "barricades on Spence Road before flood waters reach[ ] dangerous levels."*  Majority Opinion ¶ 10.  Ultimately, for this to happen, the County must have and use some sort of weather monitoring, forecasting, and reporting system and know where storm run-off will flow in order to assure that vehicular traffic is barricaded from travel across Walnut Creek before dangerous waters arrive.

{39} The second notion is that the County's failure to "have done something more than it did to determine when to prevent motorists from attempting to cross Walnut Creek at times of flooding," Majority Opinion ¶ 17, is "more like the activities that have been held [in New Mexico cases] to constitute maintenance."  Majority Opinion ¶ 19.

Were the majority rather to see the negligent act as failure to have some sort of weather monitoring, forecasting, and reporting system, the immunity waiver gate could not be opened by reference to New Mexico cases.

{40} To determine if the negligent act pled and asserted in a summary judgment proceeding can, if proven, amount to "subsequent maintenance," we must look to *the negligent act.  The negligent act* in the present case is not the simple failure to place barricades.  The negligent act is the failure to have a system that assures the barricades are in place in order to prevent vehicles from crossing the arroyo.  The initial question to be answered in this case on summary judgment was a legal question of whether "subsequent maintenance" is intended by the Legislature to include this negligent act.  The district court did not think so.  Neither do I.

{41} No averment or proof exists that once the County learned of the water in Walnut Creek it failed to exercise due care in getting barricades to the area.  In order to get barricades on Spence Road in time to prevent all vehicles from crossing Walnut Creek when dangerous waters are expected, the County must regularly monitor and forecast the weather.  Reliance solely on a process of awaiting reports from citizen or law enforcement naked-eye observation of storms and flowing waters simply cannot satisfy Plaintiffs' real demand: barricading the road to prevent any vehicles from crossing an arroyo that has dangerous waters.

{42} The majority's approach, with which I disagree, is to see the negligent act as solely the failure to place barricades, and not to go behind or beyond that; then to find the failure to place barricades (because this is tantamount to failing to place traffic controls) sufficient as a matter of law to come within the concept of subsequent maintenance; and then to move on to the jury.  The majority's description of the negligent act is too narrow.  Were we to substitute what really is the

---

1.  The County stated in its answer brief that this alleged failure was the dispositive issue below and on appeal, that Plaintiffs failed to address it in their brief in chief, and that, "the trial court recognized[ ] Plaintiffs claimed factual disputes would have become relevant only if this issue of legislative intent had been resolved in their favor."  Plaintiff[s] did not file a reply brief attacking these statements or attacking the County's characterization of the issue on appeal.

negligent act, the majority's interpretation of Section 41–4–11(A) would be too broad.

{43} The placement of traffic controls, fences, warning signs, and the location of a school bus stop, Majority Opinion ¶ 18, are fixed remedies for dangerous conditions of which the government is aware or by the exercise of reasonable care should be aware. The fixed remedy for dangerous arroyo waters is to design the road so it does not cross through the arroyo, but rather, by a bridge, crosses over the arroyo. However, the government is immune if the claim were failure to design a road and construct a bridge so as to prevent dangerous conditions the government should have thought about. *See* § 41–4–11(B)(1), (2). Plaintiffs, therefore, look to something beyond warning signs but short of design defects or failure to construct bridges. Plaintiffs look to a storm monitoring, predicting, and reporting system to ultimately assure timely prevention of vehicular arroyo crossings.

{44} Neither the condition nor the remedy (short of a bridge) is static; they are intermittent and infrequent. The prevention Plaintiffs want must occur based on judgments about periodic surface water run-off after observing by equipment or direct eye conditions involving likely rainfall and run-off. The prevention cannot occur from a fixed traffic control, fence, warning, or barricade.

{45} The TCA is the culprit here, not the County. The majority has impliedly taken the TCA to task. It has held the government, if not the Legislature, responsible by its expansion of "subsequent maintenance" beyond its plain and intended meaning. The Legislature did not intend by the TCA to remedy every wrong or to compensate drivers whenever· the government is negligent. *See* § 41–4–2(A). The breadth and scope, thus far, of our Court's and the Supreme Court's still viable interpretations of Section 41–4–11(A)'s "subsequent maintenance" neither suggest nor require the majority's holding today. Perhaps this case falls into a crack—a gap in the law. The alleged negligent act does not amount to subsequent maintenance, nor is it a design defect or failure to construct a bridge.

{46} I have no idea how many Spence Roads crossing Walnut Creeks exist throughout New Mexico. My guess is they number in the hundreds. New Mexico citizens, New Mexico legislators, and highway department and local government employees and officials have all undoubtedly experienced their own Spence Road circumstance. Why does government not construct adequate bridges where known dangerous arroyo waters cross roadways? Or, as Plaintiffs demand, have a weather monitoring, forecasting, and reporting system in place for the purpose of barricading vehicular traffic before it reaches the flooding arroyo. The majority corrects this failure of government by expanding the reach of Section 41–4–11(A), permitting a jury to determine that a county's failure to provide a weather monitoring, forecasting, and reporting system makes the county liable for damages.

{47} By its expanded interpretation today, perhaps the majority's purpose is to test the Legislature's ability or will to repudiate today's decision. *See Miller v. N.M. Dep't of Transp.*, 106 N.M. 253, 741 P.2d 1374 (1987); *see also Gallegos v. Sch. Dist. of W. Las Vegas*, 115 N.M. 779, 782–83, 858 P.2d 867, 870–71 (Ct.App.1993) (Judge Hartz's concurring opinion stating the Legislature's 1991 amendment to Section 41–4–3(E) of the Tort Claims Act repudiated *Miller*). The better approach is not to expand Section 41–4–11(A) far beyond its intended coverage, but to draw to the Legislature's attention the need to address the dangerous conditions that exist throughout the State because arroyos cross roads and carry dangerously fast moving rainfall run-off.

{48} It is significant to note that the Traffic Safety Act, NMSA 1978, §§ 66–7–501 to –511 (1978, as amended through 2000), gives a State agency wide-ranging powers and duties relating to investigation, research, and study of accidents and accident prevention. *See* § 66–7–506. Among other things, the agency is to act as a clearinghouse for all traffic safety information used throughout the State and is to cooperate with and assist local organizations and officials. *See* § 66–7–506(D), (E), (I). It is to make studies and recommendations through the secretary of

highway and transportation to the Legislature concerning safety regulations and laws and is to report annually to the governor concerning its assistance to local organizations and officials. *See* § 66–7–506(H), (I). If it has not already done so, perhaps this agency should study how best to prevent vehicles from entering arroyo flood waters and make recommendations to the Legislature.

{49} Under the majority opinion, the State and every county in the State now waive immunity for claims of failure to implement systems and processes to monitor, forecast, and report existing and potential rainfall that is likely contributed to dangerous surface water run-off in order to protect citizens from every Spence Road–Walnut Creek crossing that exists in their county and in the State.

{50} For the reasons I have expressed, I dissent.